COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-358-CR

TROY DALE JOHNSTON APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

A jury convicted Appellant Troy Dale Johnston of aggravated sexual assault of a child younger than fourteen years old and assessed his punishment at confinement for life.  The trial court sentenced him accordingly, and Johnston perfected this appeal.  In three points, Johnston claims that the evidence is legally and factually insufficient to support his conviction and that the trial court erred by overruling his objection to improper jury argument by the State during its opening statement.  For the reasons set forth below, we will affirm the trial court’s judgment.

II.  Factual Background

In the spring of 2005, Lisa Combs, the director of the Little People’s Playhouse day care, was assisting another employee with nap time in five-year-old E.J.’s classroom.  E.J. is developmentally and language delayed by about two years.
(footnote: 1)  As the children were lying down to nap, E.J. “popped her head up” and said, “My daddy licked my bo-bo.”  Ms. Combs felt shocked and said, “I’m sorry, honey.  What did you say?”  E.J. repeated the statement.

Gary and Michelle Horn were E.J.’s foster parents at the time.  E.J. had been living with them for some time.  The assistant director of the day care was also living with the Horns, and Ms. Combs knew this and knew the Horns personally from her experience with them at the day care.  Consequently, when E.J. said, “My daddy licked my bo-bo,” even though E.J. did not name the man who had “licked her bo-bo,” Ms. Combs did not think she was referring to Gary Horn.  Ms. Combs agreed that she “automatically assumed” that E.J. was not referring to Gary Horn and did not ask E.J. to whom she was referring. 

E.J. testified after Ms. Combs.  E.J.’s entire direct testimony is eight pages in the reporter’s record.  E.J. was told that she was there to talk about “Troy,” and was shown two anatomically correct dolls.  She identified the body parts of the dolls and then was asked,

Q.  Has anyone ever touched you on your vagina [sic
(footnote: 2)]?

A.  Yes.

Q.  Who did that?

A.  Troy.

Q.  Okay.  And did he touch you–what did he touch you with?

A.  Tongue.

. . . .

Q.  And what do you call this right here, E.J.?

A.  The penis.

Q.  The penis.  Have you ever seen anyone’s penis?

A.  (moves head side to side.)

Q.  Never seen anyone’s penis.  Did you ever see Daddy Troy’s penis?

A.  Yes.

Q.  When you saw it did it stick down or stick up or stick out?      How did it stick?

A.  Up.

Q.  It stick up?  Did anything come out of it?

A.  Yes.

Q.  What came out of it?

A.  Lotion.

Q.  Lotion.  What color was the lotion?

A.  White.

Q.  It was white.  Did Daddy Troy ever put lotion on you?

A.  Yes.

Q.  Where would he put it?

A.  Don’t know.

Q.  You don’t know.  Well, did he put it on your body?

A.  Yes.

Q.  Where on your body?

A.  On my arms and legs and feet and bottom and vagina.

Q.  Okay.  Now E.J., this is really important.  Did anyone except           Daddy Troy, ever put their tongue on your vagina?

A.  (moves head up and down.)

Q.  Who else did that?

A.  Gary.

Q.  Gary did that too?  Did you tell anyone Gary did that?

A.  Yes.

Q.  Who told you that Gary did that; do you remember?

A.  I remember it in my brain.

Q.  You remember it in your brain?

A.  (moves head up and down.)

   

On cross-examination, E.J. testified that when she lived with Gary and Michelle Horn she called them Daddy Gary and Momma Michelle.  She currently lives with Caroline Williams, her maternal aunt.  E.J. calls Caroline “mama” but testified that Caroline “doesn’t have a daddy” at her house. 

E.J. testified that Caroline had been in the courtroom and had been trying to help her say the right things.  Caroline had taught her the words vagina and penis.  E.J. agreed several times that Caroline did not like Daddy Troy and had told her to say bad things about Daddy Troy.  

On cross-examination and on redirect examination, E.J. continued to equivocate concerning the identity of the person who had licked her. She agreed on cross-examination that Daddy Troy didn’t really lick her and that it was Daddy Gary who had licked her.  But then on redirect, she testified that  Daddy Troy had licked her in his bedroom; her birth mother Kathy had been present, and it had happened only once.  On recross, E.J. agreed that when she lived with Daddy Troy, he did not allow kids in his room.  She again agreed that it was not Daddy Troy who had licked her, but that it was Daddy Gary who had licked her. 

Donna Wright testified that she was a pediatric nurse practitioner employed with Cook Children’s Medical Center in Fort Worth as the clinic coordinator for the Care Team, which is a specialized unit that sees children who have been referred to the hospital as alleged victims of sexual abuse, physical abuse, or neglect.  On July 20, 2005, she saw E.J. as a patient; E.J. was five years old.  Wright testified that she had received information that E.J. was delayed developmentally.  Wright referred to her notes and testified that she had started E.J.’s interview by asking whether anyone had ever touched her in a way that she didn’t like, and that E.J. had answered “no.”  Wright testified that this is not an uncommon response because she is a stranger to the children.
(footnote: 3)  At some point during the interview, Wright began showing E.J. anatomical drawings.  E.J. indicated—by pointing to the male drawing—that she had been touched by a male hand and by male genitalia.  Ultimately, Wright testified that 

[s]he said that she was touched with his penis on her genital area, with his hand on her genital area, with his penis on her anal area, and with his hand on her anal area.  She also said that he put his mouth on her genital area, and that she put her mouth on his, that he put his mouth on her anal area and that he rubbed on her genital area and that she had to touch his penis and that something white came out of his penis.  Where, at that point, I asked, “Where did that go?” and she said –she pointed to her abdomen at that point.

Wright testified that E.J.’s physical exam was normal, and that she had expected it to be normal. 

Darlene Pile testified that she works for Child Protective Services (CPS) and that in June 2004 she was assigned to investigate the Johnston family.  On approximately June 24, 2004, the Johnstons consented to voluntarily place their three children—including E.J.—with relatives.  Prior to E.J.’s placement with Appellant’s sister, Tina Hewitt, CPS, via Ms. Pile, conducted a videotaped interview of E.J. for the purpose of making certain that there had been no sexual abuse of E.J.  At that point, E.J. did not make an outcry of any type of sexual abuse.  Pile testified that E.J. appeared to be a normal child except for her developmental delay. After the interview, Pile made a finding that there was no reason to believe that E.J. had been sexually abused.  The day after the interview, E.J. was voluntarily placed with Tina Hewitt.  Pile testified that visitation by the parents after such a placement is controlled by CPS and that she did not believe at that point that the child had unsupervised contact with Johnston.  Later in her testimony, however, Pile testified that the policies and procedures of CPS were certainly that Johnston was not supposed to have unsupervised contact with his children, but that she was not present for the monitoring of all visits because it was no longer her case; therefore, she did not have personal knowledge of whether all of the visits were supervised or not.  In October 2004, CPS took custody of the Johnston children; the State pointed out in its questioning that CPS would not “swoop in” and take the children unless something bad had happened.  Finally, Pile testified that it is not uncommon for a child to make a delayed outcry, especially a child with verbal developmental delays like E.J. 

Teresa Haney testified that she had worked for CPS for over twelve years  and that she became involved with the Johnston family approximately three or four months before E.J. made her outcry at the daycare.  She was asked whether in the course of her investigation the name Gary Horn came up; she said that Mr. Horn’s name was brought up by Kathy Johnston, not by E.J.  Haney testified that the Johnstons terminated their rights to all of their children, including a fourth child that had been recently born.  After defense counsel had established on cross-examination that Jennifer Dalby was a courtesy worker assigned to E.J. after E.J. was placed out of the area, Haney was asked,

Q.  And you talked with Ms. Dalby, did you not?

A.  No, I did not.

Q.  You received communications from Ms. Dalby, did you not, ma’am?

A.  Not directly, no.

Q.  Ma’am, did you not make a complete and thorough report of everything that was going on in the case, a log of contact and narratives, as y’all call them?

A.  Yes.

Q.  And you don’t recall talking to Jennifer Dalby at any time or receiv[ing] any e-mail from Jennifer Dalby?

A.  Not directly, no.

[objection omitted]

Q.  As a matter of fact, isn’t it true that during a visit, a supervised visit of — with Jennifer Dalby or with yourself being present, because I’m not sure which one of you was with E.J. at the time, but E.J. said, according to your own report, Gary licked her bottom at a random moment during the visit.  Mr. Johnston, meaning Troy Johnston, went ballistic.  You don’t recall anything like that, ma’am?

A.  I received an e-mail but not directly from her.

After this answer, defense counsel asked a few more questions attempting to demonstrate CPS’s lack of cooperation with him.  Then he passed the witness. 

III.  Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to 
the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  That is, under the first 
Watson
-prong, we review all of the evidence weighed by the jury both for and against the challenged finding to determine whether the proof of guilt is so obviously weak as to undermine confidence in the jury's determination
.  
Johnson
, 23 S.W.3d at 11.  Our review of the evidence, however, must employ an appropriate deference to the jury’s findings to prevent an appellate court from substituting its judgment for that of the fact finder, and our evaluation of the evidence should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony.  
Jones
, 944 S.W.2d at 648.
 The degree of deference we are to provide to the jury’s findings must be proportionate with the facts we can accurately glean from the trial record.  
Johnson
, 23 S.W.3d at 8.  A factual sufficiency analysis can consider only those few matters bearing on credibility that can be fully determined from a cold appellate record.  
Id
.  Such an approach occasionally permits some credibility assessment but usually requires deference to the jury's conclusions based on matters beyond the scope of the appellate court's legitimate concern.  
Id
.  

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”
 
 Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.” 
Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

IV.  Legal Sufficiency of The Evidence

The State was required to prove that Johnston knowingly or intentionally caused the sexual organ of E.J., a child younger than fourteen years, to contact Johnston’s mouth.  
See
 
Tex. Pen. Code Ann.
 §22.021(a)(1)(B)(I), (a)(2)(B) (Vernon 2006).  After reviewing the evidence in the light most favorable to 
the verdict, it is clear that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt; as set forth above, E.J. testified concerning each element of the offense, and her testimony alone constitutes legally sufficient evidence to support Johnston’s conviction
.  See, e.g., May v. State
, 
139 S.W.3d 93, 97 (Tex. App.—Texarkana 2004, pet. ref’d) (
noting testimony of child victim alone is sufficient to support conviction for sexual assault
); 
West v. State
, 121 S.W.3d 95, 
111 (Tex. App.—Fort Worth 2003, pet. ref’d) (same);
 
Empty v. State
, 972 S.W.2d 194, 196 (Tex. App.—Dallas 1998, pet. ref'd) (same).  We overrule Johnston’s first point.

V.  Factual Sufficiency of The Evidence

Here, the element of the offense challenged by Johnston is the requirement that the State prove that he—as opposed to someone else—sexually assaulted E.J.
(footnote: 4)  The only evidence presented to the jury to establish that it was Johnston who sexually assaulted E.J. was E.J.’s own testimony; as set forth above, 
E.J. equivocated concerning whether it was Daddy Troy or Daddy Gary who had sexually assaulted her.  But the resolution of this conflict in E.J.’s testimony is one that requires great deference from this court.  We were not in the courtroom when E.J. testified, we did not see her demeanor, and we did not hear the intonation or inflection in the questions asked to her and answered by her.  Additionally, although the record reflects that E.J. is developmentally delayed, the cold record before us—as opposed to her live testimony provided to the jury—provides us with no insight as to how this developmental delay impacted her testimony.  In short, giving due deference to the jury’s resolution of this conflict in E.J.’s testimony, and viewing all of the other evidence in a neutral light, the proof of Johnston’s guilt is not so obviously weak as to undermine our confidence in the jury's determination
.  
Johnson
, 23 S.W.3d at 11.

Moving to our analysis under the second 
Watson-
prong, we examine all of the evidence in a neutral light to determine whether the conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson
, 23 S.W.3d at 11.  The evidence supporting the jury’s finding, as set forth above, is E.J.’s testimony that Johnston licked her with his tongue inside her vagina in his bedroom.
(footnote: 5)  The evidence that conflicts with the jury’s finding that Johnston was the perpetrator of a sexual assault against E.J. is E.J.’s equivocal testimony that Johnston both did and did not lick her, that Daddy Gary both did and did not lick her, Darlene Pile’s testimony that in a June 2004 videotaped interview conducted the day before 
E.J. was voluntarily placed outside Johnston’s home—conducted for the purpose of determining whether E.J. had suffered any sexual abuse—E.J. did not make an outcry concerning any sexual abuse, and Teresa Haney’s testimony that Kathy Johnston called CPS on several occasions and indicated that she believed Gary Horn was the perpetrator.
(footnote: 6)  Pile, however, on redirect examination explained that even though E.J. had been voluntarily placed with Johnston’s sister and unsupervised visits should not have occurred, she had no idea whether they did in fact occur.  Pile and nurse practitioner Donna Wright both testified that a delayed outcry is not unusual in a young child.  And Haney testified that Kathy Johnston called CPS concerning Gary Horn only after her husband had been charged with the offense.  

Thus, in summary, Johnston offered evidence that E.J. had not been sexually assaulted prior to June 2004 and that he did not have access to E.J. after June 2004.  The State countered Johnston’s evidence with evidence that E.J. may have been sexually assaulted prior to June 2004 but made a delayed outcry, that E.J. may have been sexually assaulted after June 2004, and that Johnston did have access to E.J. prior to June 2004 and may have had access to her after June 2004.  

To reverse under the second 
Watson
-prong, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the 
verdict.  
Watson
, 204 S.W.3d at 417.
  
Here, no objective basis in the record exists for concluding that the great weight and preponderance of the evidence contradicts the verdict.  To the contrary, the jury could have resolved the conflicts in E.J.’s testimony and the other evidence consistently with its finding that Johnston was the perpetrator of a sexual assault against E.J.

We overrule Johnston’s second point.

VI.  Argument During Opening Statement

In his third point, Johnston argues that the trial court erred by overruling defense counsel’s objection to a portion of the State’s opening statement.  The record reflects the following exchange:

[Prosecutor]: I hope she finds the courage in her to tell you what happened.  That’s my hope.  I can’t count on it because she’s six.  But I hope y’all get to hear her talk because she did tell people along the way who ignored it, including her mother.  Her mother, who chose to ignore her outcries before she got in foster care.  Her mother, who chose to give up all four of her children that she had to stay with this man.  Her mother who called CPS repeatedly to try to muddy the waters—

[Defense Counsel]: Excuse me, Your Honor.  I am going to object to this being argument as opposed to opening statement.

[The Court]: Overruled.

[Prosecutor]: Thank you, Your Honor.  Her mother, who repeatedly called CPS and tried to muddy the waters and give new suspects and new details, that never came from [E.J.], that came from Kathy Lewis Johnston.

 Teresa Haney ultimately did testify that Kathy Johnston had called CPS and had indicated her belief that Gary Horn was the perpetrator.

The prosecutor’s above quoted comment during opening statement was a proper statement of a fact that the prosecution in good faith expected to and did prove.  
See
 
Tex. Code Crim. Proc. Ann.
 art. 36.01(a) (Vernon 2007); 
Parra v. State
, 935 S.W.2d 862, 871 (Tex. App.—Texarkana 1996, pet. ref’d).  The trial court did not abuse its discretion by overruling Johnston’s objection to this argument.  
Accord Banks v. State
, 643 S.W.2d 129, 133 (Tex. Crim. App. 1982), 
cert. denied
, 464 U.S. 904 (1983).  We overrule Johnston’s third point.

VII.  Conclusion

Having overruled each of Johnston’s three points, we affirm the judgment of the trial court.

SUE WALKER

JUSTICE

PANEL B: DAUPHINOT, GARDNER, and WALKER, JJ.

PUBLISH

DELIVERED: July 12, 2007

FOOTNOTES
1:
Ms. Combs testified that although E.J. was five years old at the time, she was “mentally, maybe three.”  In response to the question, “[i]t’s true, isn’t it, that you are basically dealing with a child who is developmentally three years old, mentally?,” she answered, “That would be very close to what I think.” 

2:
See Tyler v. State
, 950 S.W.2d 787, 789 (Tex. App.—Fort Worth 1997, no pet.) (Dauphinot, J., pointing out the anatomically correct usage of the word vagina).

3:
After defense counsel objected to Wright’s testimony on hearsay grounds, the State contended that the testimony fell within the hearsay exception for statements provided for medical diagnosis and treatment.  Following a voir dire of Wright outside the presence of the jury, the trial court ruled that Wright’s testimony “regarding who [licked] and where [the licking occurred]” was hearsay and not admissible.  

4:
The record before us contains a large amount of evidence that E.J. was sexually assaulted; the point Johnston raises on appeal challenges the evidence that Johnston was the person who committed the offense.

5:
In addition to this evidence, the State points to much evidence that does establish a sexual assault occurred, including that E.J. knew a penis pointed up and saw a white discharge come from a penis.  This evidence, while clearly constituting evidence that E.J. suffered a sexual assault, does not weigh either for or against the identity element of the offense challenged by Johnston. 

6:
Although Teresa Haney testified that she had received an email, defense counsel’s question to her regarding E.J.’s alleged comment that Daddy Gary had “licked her bo-bo” is not evidence, and counsel did not ask further questions on this issue, so we do not include it in our analysis.  
Accord
 
Rodriguez v. State
, No. 01-05-00032-CR, 2006 WL 648859, at *8 (Tex. App.—Houston [1st Dist.] Mar. 16, 2006, pet. ref’d) (mem. op.) (not designated for publication).