

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-07-235-CR

RICHARD COLUMBUS STRICKLIN II                                    APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

Appellant Richard Columbus Stricklin II appeals his two convictions for indecency with a child by contact.  In two points, appellant argues that the evidence is factually insufficient to support his convictions and that the trial court abused its discretion by overruling his objection to the State's improper

---

[1] *See* TEX. R. APP. P. 47.4.

notice of extraneous offense testimony during the punishment phase.  We affirm.

## II.  Background Facts

In February 2004, Jessica[2] told her mother, Deborah, that her father, appellant, had sexually abused her.  Jessica was ten or eleven years old when appellant began abusing her and seventeen years old at the time of trial.  At the time of the outcry, Deborah and appellant were divorced.  Deborah was living in Arlington, Texas, and appellant was living with his parents in Mountain View, Missouri.  Deborah and appellant have two other daughters, Abigail and Teresa, ages sixteen and fourteen, respectively at the time of trial.

Jessica stated that the abuse occurred when appellant was living in an apartment in Arlington, Texas.  Jessica testified that appellant initially touched her breasts with his hands and mouth.  She further stated that appellant would touch her inner thigh and [genitalia] with his hands, put his mouth on her [genitalia], and lie on top of her while she was asleep.  Jessica also remembered single incidents of appellant kissing her on her mouth and attempting to put his penis in her [genitalia].

---

[2] *Cf.* TEX. R. APP. P. 9.8, 71 TEX. B.J. 287-88 (Tex. 2008, scheduled to take effect Sept. 1, 2008) (authorizing appellate courts to redact the names of minor children and parents in appellate proceedings following parental-rights termination proceedings or juvenile court proceedings and replace them with fictitious names).  Therefore, the names of minors and parents have been redacted and replaced with fictitious names.

2

After Jessica told her about the abuse, Deborah called Child Protective Services ("CPS").  She then took Jessica to Alliance for Children in Arlington, Texas, to speak with a CPS investigator regarding the abuse and also took Jessica to Cook Children's Medical Center for a sexual abuse exam.

Abigail moved to Missouri to live with appellant's parents before Jessica made the outcry, and Teresa moved to Missouri when she was twelve years old.  While Abigail and Jessica were living in Missouri, appellant lived at his parents' house in Missouri when he was not on active duty with the Navy Reserves or driving a truck.  Deborah and Jessica would travel to Missouri for the holidays to visit Abigail and Teresa.  During these visits, Jessica was never allowed to have contact with appellant.

The jury found appellant guilty of two counts of indecency with a child by contact and assessed his punishment at thirteen years' in the Institutional Division of the Texas Department of Criminal Justice for each count, to run concurrently.[3]

---

[3] The jury acquitted appellant of three counts of aggravated sexual assault of a child.  Additionally, the State did not proceed to trial on an additional indecency with a child offense.

### III.  Factual Sufficiency

In his first point, appellant asserts that the evidence is factually insufficient to support his convictions for indecency with a child by contact.

### A.  Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust.  *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.  *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to

4

overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground. *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); *Johnson*, 23 S.W.3d at 7.

## B. Analysis

At trial, Jessica testified that she was ten or eleven years old when appellant began to sexually abuse her. Jessica stated that at night she would go to bed in the bedroom that she shared with her sisters Abigail and Teresa at appellant's apartment and that she would wake up in appellant's bed. She said that when she woke up, her shirt would be on the floor. Jessica testified that she never talked to appellant about the abuse but instead tried to ignore it. Jessica stated that appellant touched her breasts with his hands and mouth, kissed her on the mouth one time, touched her inner thigh and [genitalia] with his hands, and put his mouth on her [genitalia]. She also stated that she would wake up with appellant lying on top of her, and one time appellant attempted to put his penis in her [genitalia]. She stated that she would not get up during the abuse but instead would pretend like she was sleeping.

Jessica testified that she told Abigail about the abuse. After telling Abigail what had occurred, Abigail then confronted appellant. Jessica stated that she stood in the hallway when Abigail was talking with appellant because she was afraid. After the confrontation, the abuse stopped for a couple of months, and then Jessica stopped spending the night at appellant's apartment.

Deborah, Jessica's mother, testified that in February 2004, she was talking with Jessica in the laundry room when Jessica began to cry. Deborah stated that after Jessica would not calm down, she asked Jessica if somebody had touched her inappropriately, and Jessica shook her head "yes." After listing off several names of family members and friends, Deborah asked Jessica if appellant had touched her, and Jessica shook her head and "busted out crying." Deborah then asked Jessica if the abuse happened on more than one occasion, and Jessica shook her head "yes." Jessica never gave Deborah any specifics about the sexual abuse. Deborah estimated that the conversation lasted thirty minutes.

After Jessica told Deborah about the sexual abuse, Deborah sent appellant an email stating that she knew he had sexually abused Jessica and that he was not going to see Jessica, Abigail, or Teresa anymore. Appellant wrote Deborah back in an email the next day. The email stated in pertinent part:

> Back when jered [sic] stayed with me & the girl's [sic], the girls would take turns sleeping in bed with me. Lisa[, my estranged wife,] and [I] had separated and I was having erotic dream's [sic] about Lisa. [Abigail] approached me about a week later and ask[ed] if we could talk in my room. She said that her and [Jessica] had talked about it and that they didn't think it was right what was happening. I was stunned[.] I told her & [Jessica] that I apologized for any thing that had happened and swore it would never happen

7

again. From that day forward the girl's [sic] never slept in bed with me again by my choice.

Deborah then called CPS and took Jessica to Alliance for Children in Arlington, Texas, to be interviewed by CPS. She also took Jessica to Cook Children's Medical Center for a sexual abuse exam. Deborah further testified that after Jessica told her about the abuse, she allowed supervised visits between appellant, Jessica, Teresa, and Abigail at her house approximately three to four times. She stated that appellant contacted the girls after the allegations were made.

Jessica testified that after making the outcry to Deborah, she called her cousin Meredith and told her about the abuse. However, Meredith told Jessica that she was uncomfortable talking about the abuse, so Jessica stopped talking about it.

Jessica stated that she went to Missouri for the holidays after she made the outcry to visit her sisters and grandparents. Jessica testified that she wanted to see appellant during the visits. Additionally, Jessica stated that she considered moving to Missouri to live with her grandparents after she made the allegations but that she is no longer going to move.

Jamye Coffman, medical director of the CARE team at Cook Children's Medical Center, testified that on March 9, 2004, she spoke with Jessica, then

8

thirteen years old, about the sexual abuse. She stated that Jessica was initially reluctant to talk about the abuse. Jessica told Coffman that the abuse began when she was eleven years old. She said that she woke up one morning without any clothes on.

Jessica told Dr. Coffman that when she was eleven or twelve years old, appellant would touch her on her breasts and privates with her panties off with his hand, put his tongue in her privates, made her masturbate him, ejaculated on her privates one time, and French kissed her. Dr. Coffman testified that Jessica told her that she and Abigail confronted appellant about the abuse, and appellant told them that it would stop. Dr. Coffman stated that her diagnosis was sexual abuse with nonspecific findings.

Edna Campbell, a CPS investigator, testified that she received a referral on February 10, 2004, regarding the sexual abuse of Jessica. Campbell stated that she interviewed Jessica on February 13, 2004, for approximately an hour. During the interview, Jessica stated that appellant had touched her inappropriately when she was visiting him. Jessica said that on several occasions she had awakened without her underwear on or without any clothes on.

In particular, Jessica recalled two specific instances of abuse, during Christmastime and late summer 2003. Jessica told Campbell that she would

9

wake up naked. Jessica told Campbell that during Christmas one year, she was at her grandparents' house and woke up with appellant in her bed, even though she remembered appellant's going to sleep on the couch the night before. Additionally, Jessica stated that in the summer of 2003, she woke up in appellant's bed, rolled over, and ran back into the bedroom that she shared with her sisters. Further, in her written statement, Jessica stated that she woke up with a "yellow pile of liquid on her vagina."

During the interview, Jessica stated that she was not sure whether the abuse had actually occurred or whether she was just dreaming. However, Jessica stated that she did not think it was a dream. Campbell testified that Jessica never stated that appellant laid on top of her or French kissed her nor that she performed masturbation on appellant. However, Campbell further stated that she felt like Jessica was not telling her the complete story.

Campbell further testified that on February 26, 2004, she spoke with appellant at the advocacy center about the abuse. When Campbell asked appellant if the abuse had occurred, he neither confirmed nor denied it but simply stated that he could not remember if it had occurred because he was a deep sleeper.

Additionally, appellant said that he had a king-size bed and that Jessica and Abigail would take turns sleeping in his bed at night because he had a

roommate at the time. He stated that at the end of the summer in 2001, the girls told him about the sexual abuse.

Abigail testified that she always shared a room with Jessica and Teresa when they were at appellant's apartment. She stated that she and Jessica would share a bed and that Jessica would normally sleep on the side of the bed next to the wall. Abigail testified that appellant never got Jessica out of their bed and took her to his bedroom because he would have had to reach across her to get Jessica. Abigail further stated that she would have awakened if appellant had attempted to get Jessica out of their bed because she is a light sleeper.

She stated that Jessica told her that appellant had abused her but that Jessica did not go into details about the allegations. Abigail then went to appellant and confronted him about the abuse. Abigail testified that when she told appellant that Jessica stated that he had abused her, he was "puzzled" and did not know what she was talking about. Further, Abigail said that appellant never personally abused her.

Abigail stated that after Jessica made the outcry, Deborah and Jessica went to Missouri for Thanksgiving, Christmas, and spring break. She stated that they were not allowed to stay at her grandparents' house because

11

appellant was living there. Abigail testified that Jessica was upset and confused that she could not stay at the house.

Teresa, appellant's youngest daughter and Jessica's sister, stated that she and her sisters had their own room when they slept at appellant's apartment. Teresa testified that they slept on a bunk bed at appellant's apartment, that she always slept on the top bunk bed, and that Jessica and Abigail would sleep on the bottom bunk. According to Teresa, Jessica would always sleep on the side of the bed that was against the wall because Jessica was afraid she would fall off the bed. Teresa stated that Jessica and Abigail never acted like they were afraid of appellant.

Additionally, Teresa said that after Jessica made the allegations of sexual abuse, appellant drove Teresa back to Texas from Missouri, and Deborah, her mother, did not express any concerns about her being in the car alone with appellant. Teresa testified that appellant always slept on the couch at her grandparents' house in Missouri and that Jessica was always in a bedroom with either herself or Teresa.

Carolyn Kay ("Carolyn"), appellant's mother, testified that appellant lived on the farm in Missouri with her and her husband. She stated that Abigail moved to the farm before Jessica made the allegations, and Teresa moved after

12

the allegations were made. Carolyn testified that Deborah was never concerned that Abigail and Teresa were living in the same house as appellant.

She stated that Deborah and Jessica went up to Missouri the first Thanksgiving after Jessica made the outcry. Carolyn testified that Deborah and Jessica wanted to stay at her house during their visit but that she told them that they could not stay there because appellant was living there. Additionally, Jessica was "extremely upset" that she could not see appellant. Carolyn stated that Deborah and Jessica went to Missouri for Christmas in 2004 and for Abigail's birthday in May 2005.

Carolyn stated that Jessica has a lot of problems and that she is a "drama queen." Carolyn testified that Jessica would lie to get attention and that she gets irritated when her sisters get more attention than she does.

Furthermore, Carolyn testified that it was not possible for Jessica to wake up with appellant in her bed at her house because she would have awakened when appellant walked up the stairs. She stated that whenever Jessica was at her house, the girls would sleep upstairs, and appellant would sleep on the couch downstairs. Carolyn further testified that Abigail is a light sleeper.

Meredith, appellant's niece and Jessica's cousin, testified that when she and Jessica would stay at their grandparents' house, they would always sleep in the same bed. She said that Abigail and Teresa would sleep on the floor in

13

the same room with them. Meredith stated that Jessica never had a room to herself at their grandparents' house.

Further, Meredith stated that Jessica called her one night several months after making the sexual abuse allegations and told her that she had had a dream in which a guy with no face was chasing her and she could not get away from him. Jessica then stated that she began remembering how things "had happened to her at night when she was sleeping." Meredith then asked Jessica if she knew what sexual intercourse was, and Jessica stated, "yeah and no." Jessica stated that she was not sure if appellant had really abused her or if she had dreamed that she had been abused. Additionally, Meredith testified that Jessica is not very truthful.

Appellant contends that the evidence is factually insufficient to show that he committed the offenses of indecency with a child. Appellant asserts that the record shows that Jessica dreamed up the allegations against him and that she "is a liar."[4] However, appellant acknowledged in an email to Deborah that Jessica and Abigail had confronted him about the abuse. He also admitted having an erotic dream during the time the girls were taking turns sleeping in

---

[4] The testimony of a child victim alone is sufficient to support a conviction for indecency with a child. *Johnston v. State,* 230 S.W.3d 450, 455 (Tex. App.—Fort Worth, 2007 no pet.).

14

the bed with him. Additionally, when appellant spoke with Campbell about Jessica's outcry, he told her that he could not remember if he had sexually abused Jessica but that Jessica and Abigail had confronted him about the abuse at the end of the summer in 2001.

Deferring, as we must, to the jury's resolution of contradictory testimony and evaluation of credibility and demeanor, we cannot say that the evidence is so weak that the verdict is clearly wrong and manifestly unjust nor that the conflicting evidence so greatly outweighs the evidence supporting the verdict that the jury's determination is manifestly unjust. *See Johnson*, 23 S.W.3d at 8. Accordingly, we overrule appellant's first point.

### IV. Notice of Intent to Introduce Extraneous Offense Evidence

In appellant's second point, he contends that the trial court erred by overruling his objection to extraneous offense testimony because the state did not give him timely notice of its intent to introduce it. The State, however, argues that the trial court did not abuse its discretion because appellant was given sufficient notice about the extraneous offense.[5]

---

[5] In its brief, the State argues that appellant did not properly preserve error because he did not repeatedly object to the extraneous offense testimony. However, appellant objected four times before asking for a running objection from the trial court. Additionally, when appellant asked for a running objection, the trial court stated, "Ma'am, you have your objection. I've given it to you." Thus, the record demonstrates that appellant properly preserved error to this

15

## A. Standard of Review

The trial court's decision to admit extraneous offense evidence during punishment is reviewed for an abuse of discretion. *Sanders v. State*, 191 S.W.3d 272, 276 (Tex. App.—Waco 2006, pet. ref'd), *cert. denied,* 127 S. Ct. 1141 (2007); *see also Lajoie v. State*, 237 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, no pet.). The trial court's decision should be reversed on appeal only if there is a showing of a clear abuse of discetion. *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992)*.* Only if the court's decision falls outside the "zone of reasonable disagreement" has it abused its discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

## B. Applicable Law

Article 37.07, section 3(g) of the Texas Code of Criminal Procedure provides as follows:

> On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of Evidence. If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the

issue because the trial court clearly understood the extent and nature of appellant's objection and ruled on it. *See* TEX. R. APP. P. 33.1(a).

16

county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act. The requirement under this subsection that the attorney representing the state give notice applies only if the defendant makes a timely request to the attorney representing the state for the notice.

TEX. CODE CRIM. PROC. ANN. art. 37.07, §3(g) (Vernon Supp. 2007).

### C. Analysis

On July 22, 2004, appellant properly filed his request for notice of extraneous offenses and offenses to be used for enhancements under article 37.07, § 3(g) of the code of criminal procedure and rule of evidence 404(b). TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g); TEX. R. EVID. 404(b). The State filed its first notice of intent to offer extraneous offenses on April 28, 2006. On June 22, 2006, the State filed its supplemental notice of intent to offer extraneous offenses. Subsequently, on June 13, 2007, the State filed its second supplemental notice of intent to introduce evidence of extraneous offenses, other crimes, wrongs and acts under article 37.07, § 3(g). The State's second supplemental notice indicated that the State intended to offer the testimony of Paula, appellant's former stepdaughter, during the punishment phase to show that appellant had sexually abused Paula. This notice was filed nine days before the beginning of the guilt-innocence phase of trial and fourteen days before the beginning of the punishment phase.

17

The State, on timely request by the defendant, must give reasonable notice of extraneous crimes or bad acts that the State intends to introduce during the punishment phase. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g); *Burling v. State*, 83 S.W.3d 199, 202–03 (Tex. App.—Fort Worth 2002, pet. ref'd). To be reasonable, the State's notice must be given in advance of trial and must include the date on which and the county in which the alleged offense occurred and the complainant's name. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g). The purpose of the notice requirement is to prevent unfair surprise to a defendant. *Wallace v. State*, 135 S.W.3d 114, 120 (Tex. App.—Tyler 2004, no pet.); *Burling*, 83 S.W.3d at 203; *Nance v. State*, 946 S.W.2d 490, 493 (Tex. App.—Fort Worth 1997, pet. ref'd). Further, the reasonableness of the notice turns on the facts and circumstances of each case. *Scott v. State*, 57 S.W.3d 476, 480 (Tex. App.—Waco 2001, pet. ref'd); *see Fugate v. State,* 200 S.W.3d 781, 783 (Tex. App.—Fort Worth 2006, no pet.).

On June 21, 2007, appellant filed a motion for continuance alleging that he did not have adequate time to investigate Paula's sexual abuse allegations. In his motion, appellant acknowledged that the State did not learn of the extraneous offense until June 13, 2007, when Paula told her therapist about

18

the abuse. Accordingly, appellant stated that the prosecutor informed him about Paula's testimony that same day.

Because the record shows that the prosecutor informed appellant of the extraneous offense evidence as soon as the prosecutor discovered it, which was nine days prior to trial and fourteen days before it was actually used at punishment, we hold that the trial court did not abuse its discretion by overruling appellant's objection to the introduction of the evidence. *See Scott*, 57 S.W.3d at 483 (determining that six days' notice before trial was sufficient under facts of the case); *Henderson v. State*, 29 S.W.3d 616, 625 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd.) (holding that eight days' notice of extraneous offense was reasonable when the prosecutor discovered the information eight days before the testimony in the punishment phase); *see also Fugate,* 200 S.W.3d at 783 (holding that seven days' prior notice of intent to enhance punishment was adequate under facts of the case.) Accordingly, we overrule appellant's second point.

## V.  Conclusion

Having overruled appellant's two points, we affirm the trial court's judgment.


                                        TERRIE LIVINGSTON
                                        JUSTICE

PANEL F: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: June 19, 2008