COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-235-CR

 

 

RICHARD COLUMBUS STRICKLIN II                                        APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.  Introduction








Appellant Richard Columbus
Stricklin II appeals his two convictions for indecency with a child by
contact.  In two points, appellant argues
that the evidence is factually insufficient to support his convictions and that
the trial court abused its discretion by overruling his objection to the State=s improper notice of extraneous offense testimony during the
punishment phase.  We affirm.

II.  Background Facts

In February 2004, Jessica[2]
told her mother, Deborah, that her father, appellant, had sexually abused
her.  Jessica was ten or eleven years old
when appellant began abusing her and seventeen years old at the time of
trial.  At the time of the outcry,
Deborah and appellant were divorced. 
Deborah was living in Arlington, Texas, and appellant was living with
his parents in Mountain View, Missouri. 
Deborah and appellant have two other daughters, Abigail and Teresa, ages
sixteen and fourteen, respectively at the time of trial.

Jessica stated that the abuse
occurred when appellant was living in an apartment in Arlington, Texas.  Jessica testified that appellant initially
touched her breasts with his hands and mouth. 
She further stated that appellant would touch her inner thigh and
[genitalia] with his hands, put his mouth on her [genitalia], and lie on top of
her while she was asleep.  Jessica also
remembered single incidents of appellant kissing her on her mouth and
attempting to put his penis in her [genitalia]. 









After Jessica told her about
the abuse, Deborah called Child Protective Services (ACPS@).  She then took Jessica to Alliance for
Children in Arlington, Texas, to speak with a CPS investigator regarding the
abuse and also took Jessica to Cook Children=s Medical Center for a sexual abuse exam.      

Abigail moved to Missouri to
live with appellant=s parents
before Jessica made the outcry, and Teresa moved to Missouri when she was
twelve years old.  While Abigail and
Jessica were living in Missouri, appellant lived at his parents= house in Missouri when he was not on active duty with the Navy
Reserves or driving a truck.  Deborah and
Jessica would travel to Missouri for the holidays to visit Abigail and
Teresa.  During these visits, Jessica was
never allowed to have contact with appellant.

The jury found appellant
guilty of two counts of indecency with a child by contact and assessed his
punishment at thirteen years= in the Institutional Division of the Texas Department of Criminal
Justice for each count, to run concurrently.[3]  

 

 








III.  Factual Sufficiency

In his first point, appellant
asserts that the evidence is factually insufficient to support his convictions
for indecency with a child by contact.

A.  Standard of Review

When reviewing the factual
sufficiency of the evidence to support a conviction, we view all the evidence
in a neutral light, favoring neither party. 
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas
v. State, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting
the conviction, although legally sufficient, is nevertheless so weak that the
fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000).  To reverse under the second
ground, we must determine, with some objective basis in the record, that the
great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the
evidence is factually insufficient to support a conviction that is nevertheless
supported by legally sufficient evidence, it is not enough that this court Aharbor a subjective level of reasonable doubt to overturn [the]
conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s resolution of a conflict in the evidence.  Id. 
We may not simply substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at
12; Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s determination of the weight to be given contradictory testimonial
evidence because resolution of the conflict Aoften turns on an evaluation of credibility and demeanor, and those
jurors were in attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at
8.  Thus, we must give due deference to
the fact-finder=s
determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual
sufficiency must include a discussion of the most important and relevant
evidence that supports the appellant=s complaint on appeal.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding
on factual insufficiency grounds must detail all the evidence and clearly state
why the finding in question is factually insufficient and under which
ground.  Goodman v. State, 66
S.W.3d 283, 287 (Tex. Crim. App. 2001); Johnson, 23 S.W.3d at 7.








B.   Analysis

At trial, Jessica testified
that she was ten or eleven years old when appellant began to sexually abuse
her.  Jessica stated that at night she
would go to bed in the bedroom that she shared with her sisters Abigail and
Teresa at appellant=s apartment
and that she would wake up in appellant=s bed.  She said that when she
woke up, her shirt would be on the floor. 
Jessica testified that she never talked to appellant about the abuse but
instead tried to ignore it.  Jessica
stated that appellant touched her breasts with his hands and mouth, kissed her
on the mouth one time, touched her inner thigh and [genitalia] with his hands,
and put his mouth on her [genitalia].  
She also stated that she would wake up with appellant lying on top of
her, and one time appellant attempted to put his penis in her [genitalia].  She stated that she would not get up during
the abuse but instead would pretend like she was sleeping. 

Jessica testified that she
told Abigail about the abuse.  After
telling Abigail what had occurred, Abigail then confronted appellant.  Jessica stated that she stood in the hallway
when Abigail was talking with appellant because she was afraid.  After the confrontation, the abuse stopped
for a couple of months, and then Jessica stopped spending the night at
appellant=s
apartment.  








Deborah, Jessica=s mother, testified that in February 2004, she was talking with
Jessica in the laundry room when Jessica began to cry.  Deborah stated that after Jessica would not
calm down, she asked Jessica if somebody had touched her inappropriately, and
Jessica shook her head Ayes.@  After listing off several
names of family members and friends, Deborah asked Jessica if appellant had
touched her, and Jessica shook her head and Abusted out crying.@  Deborah then asked Jessica if
the abuse happened on more than one occasion, and Jessica shook her head Ayes.@  Jessica never gave Deborah any specifics
about the sexual abuse.  Deborah
estimated that the conversation lasted thirty minutes. 

After Jessica told Deborah
about the sexual abuse, Deborah sent appellant an email stating that she knew
he had sexually abused Jessica and that he was not going to see Jessica,
Abigail, or Teresa anymore.  Appellant
wrote Deborah back in an email the next day. 
The email stated in pertinent part:








Back
when jered [sic] stayed with me & the girl=s
[sic], the girls would take turns sleeping in bed with me.  Lisa[, my estranged wife,] and [I] had
separated and I was having erotic dream=s [sic] about Lisa. [Abigail]
approached me about a week later and ask[ed] if we could talk in my room.  She said that her and [Jessica] had talked
about it and that they didn=t think it was right what was
happening.  I was stunned[.]  I told her & [Jessica] that I apologized
for any thing that had happened and swore it would never happen again. From
that day forward the girl=s
[sic] never slept in bed with me again by my choice.  

 

Deborah then called CPS and
took Jessica to Alliance for Children in Arlington, Texas, to be interviewed by
CPS.  She also took Jessica to Cook
Children=s Medical Center for a sexual abuse exam.  Deborah further testified that after Jessica
told her about the abuse, she allowed supervised visits between appellant,
Jessica, Teresa, and Abigail at her house approximately three to four
times.  She stated that appellant
contacted the girls after the allegations were made. 

Jessica testified that after
making the outcry to Deborah, she called her cousin Meredith and told her about
the abuse.  However, Meredith told
Jessica that she was uncomfortable talking about the abuse, so Jessica stopped
talking about it.   

Jessica stated that she went
to Missouri for the holidays after she made the outcry to visit her sisters and
grandparents.  Jessica testified that she
wanted to see appellant during the visits. 
Additionally, Jessica stated that she considered moving to Missouri to
live with her grandparents after she made the allegations but that she is no
longer going to move.          








Jamye Coffman, medical
director of the CARE team at Cook Children=s Medical Center, testified that on March 9, 2004, she spoke with
Jessica, then thirteen years old, about the sexual abuse.  She stated that Jessica was initially
reluctant to talk about the abuse. 
Jessica told Coffman that the abuse began when she was eleven years
old.  She said that she woke up one
morning without any clothes on.  

Jessica told Dr. Coffman that
when she was eleven or twelve years old, appellant would touch her on her
breasts and privates with her panties off with his hand, put his tongue in her
privates, made her masturbate him, ejaculated on her privates one time, and
French kissed her.  Dr. Coffman testified
that Jessica told her that she and Abigail confronted appellant about the
abuse, and appellant told them that it would stop.  Dr. Coffman stated that her diagnosis was
sexual abuse with nonspecific findings.

Edna Campbell, a CPS
investigator, testified that she received a referral on February 10, 2004,
regarding the sexual abuse of Jessica. 
Campbell stated that she interviewed Jessica on February 13, 2004, for
approximately an hour.  During the
interview, Jessica stated that appellant had touched her inappropriately when
she was visiting him.  Jessica said that
on several occasions she had awakened without her underwear on or without any
clothes on. 








In particular, Jessica
recalled two specific instances of abuse, during Christmastime and late summer
2003.  Jessica told Campbell that she
would wake up naked.  Jessica told Campbell
that during Christmas one year, she was at her grandparents= house and woke up with appellant in her bed, even though she
remembered appellant=s going to
sleep on the couch the night before.  Additionally, Jessica stated that in the
summer of 2003, she woke up in appellant=s bed, rolled over, and ran back into the bedroom that she shared with
her sisters.  Further, in her written
statement, Jessica stated that she woke up with a Ayellow pile of liquid on her vagina.@   

During the interview, Jessica
stated that she was not sure whether the abuse had actually occurred or whether
she was just dreaming.  However, Jessica
stated that she did not think it was a dream. 
Campbell testified that Jessica never stated that appellant laid on top
of her or French kissed her nor that she performed masturbation on
appellant.  However, Campbell further
stated that she felt like Jessica was not telling her the complete story.

Campbell further testified
that on February 26, 2004, she spoke with appellant at the advocacy center
about the abuse.  When Campbell asked
appellant if the abuse had occurred, he neither confirmed nor denied it but
simply stated that he could not remember if it had occurred because he was a
deep sleeper.   








Additionally, appellant said
that he had a king-size bed and that Jessica and Abigail would take turns sleeping
in his bed at night because he had a roommate at the time.  He stated that at the end of the summer in
2001, the girls told him about the sexual abuse. 

Abigail testified that she
always shared a room with Jessica and Teresa when they were at appellant=s apartment.  She stated that
she and Jessica would share a bed and that Jessica would normally sleep on the
side of the bed next to the wall. 
Abigail testified that appellant never got Jessica out of their bed and
took her to his bedroom because he would have had to reach across her to get
Jessica.  Abigail further stated that she
would have awakened if appellant had attempted to get Jessica out of their bed
because she is a light sleeper.  

She stated that Jessica told
her that appellant had abused her but that Jessica did not go into details
about the allegations.  Abigail then went
to appellant and confronted him about the abuse.  Abigail testified that when she told
appellant that Jessica stated that he had abused her, he was Apuzzled@ and did not
know what she was talking about. 
Further, Abigail said that appellant never personally abused her.     








Abigail stated that after Jessica
made the outcry, Deborah and Jessica went to Missouri for Thanksgiving,
Christmas, and spring break.  She stated
that they were not allowed to stay at her grandparents= house because appellant was living there.  Abigail testified that Jessica was upset and
confused that she could not stay at the house. 

Teresa, appellant=s youngest daughter and Jessica=s sister, stated that she and her sisters had their own room when they
slept at appellant=s
apartment.  Teresa testified that they
slept on a bunk bed at appellant=s apartment, that she always slept on the top bunk bed, and that
Jessica and Abigail would sleep on the bottom bunk.  According to Teresa, Jessica would always
sleep on the side of the bed that was against the wall because Jessica was
afraid she would fall off the bed. 
Teresa stated that Jessica and Abigail never acted like they were afraid
of appellant. 

Additionally, Teresa said
that after Jessica made the allegations of sexual abuse, appellant drove Teresa
back to Texas from Missouri, and Deborah, her mother, did not express any
concerns about her being in the car alone with appellant.  Teresa testified that appellant always slept
on the couch at her grandparents= house in Missouri and that Jessica was always in a bedroom with
either herself or Teresa.








Carolyn Kay (ACarolyn@), appellant=s mother, testified that appellant lived on the farm in Missouri with
her and her husband.  She stated that Abigail
moved to the farm before Jessica made the allegations, and Teresa moved after
the allegations were made.  Carolyn
testified that Deborah was never concerned that Abigail and Teresa were living
in the same house as appellant. 

She stated that Deborah and
Jessica went up to Missouri the first Thanksgiving after Jessica made the
outcry.  Carolyn testified that Deborah
and Jessica wanted to stay at her house during their visit but that she told
them that they could not stay there because appellant was living there.  Additionally, Jessica was Aextremely upset@ that she
could not see appellant.  Carolyn stated
that Deborah and Jessica went to Missouri for Christmas in 2004 and for Abigail=s birthday in May 2005.   

Carolyn stated that Jessica
has a lot of problems and that she is a Adrama queen.@  Carolyn testified that Jessica would lie to
get attention and that she gets irritated when her sisters get more attention
than she does.     

Furthermore, Carolyn
testified that it was not possible for Jessica to wake up with appellant in her
bed at her house because she would have awakened when appellant walked up the
stairs.  She stated that whenever Jessica
was at her house, the girls would sleep upstairs, and appellant would sleep on
the couch downstairs.  Carolyn further
testified that Abigail is a light sleeper. 









Meredith, appellant=s niece and Jessica=s cousin, testified that when she and Jessica would stay at their
grandparents= house, they
would always sleep in the same bed.  She
said that Abigail and Teresa would sleep on the floor in the same room with
them.  Meredith stated that Jessica never
had a room to herself at their grandparents= house.  

Further, Meredith stated that
Jessica called her one night several months after making the sexual abuse
allegations and told her that she had had a dream in which a guy with no face
was chasing her and she could not get away from him.  Jessica then stated that she began
remembering how things Ahad happened
to her at night when she was sleeping.@  Meredith then asked Jessica if
she knew what sexual intercourse was, and Jessica stated, Ayeah and no.@  Jessica stated that she was not sure if
appellant had really abused her or if she had dreamed that she had been
abused.  Additionally, Meredith testified
that Jessica is not very truthful.   








Appellant contends that the
evidence is factually insufficient to show that he committed the offenses of
indecency with a child.  Appellant
asserts that the record shows that Jessica dreamed up the allegations against
him and that she Ais a liar.@[4]  However, appellant
acknowledged in an email to Deborah that Jessica and Abigail had confronted him
about the abuse.  He also admitted having
an erotic dream during the time the girls were taking turns sleeping in the bed
with him.  Additionally, when appellant
spoke with Campbell about Jessica=s outcry, he told her that he could not remember if he had sexually
abused Jessica but that Jessica and Abigail had confronted him about the abuse
at the end of the summer in 2001.

Deferring, as we must, to the
jury=s resolution of contradictory testimony and evaluation of credibility
and demeanor, we cannot say that the evidence is so weak that the verdict is
clearly wrong and manifestly unjust nor that the conflicting evidence so
greatly outweighs the evidence supporting the verdict that the jury=s determination is manifestly unjust. 
See Johnson, 23 S.W.3d at 8. 
Accordingly, we overrule appellant=s first point.  

IV.  Notice of Intent to Introduce Extraneous
Offense Evidence

In appellant=s second point, he contends that the trial court erred by overruling
his objection to extraneous offense testimony because the state did not give
him timely notice of its intent to introduce it.  The State, however, argues that the trial
court did not abuse its discretion because appellant was given sufficient
notice about the extraneous offense.[5]









                                     A.  Standard of Review

The trial court=s decision to admit extraneous offense evidence during punishment is
reviewed for an abuse of discretion.  Sanders
v. State, 191 S.W.3d 272, 276 (Tex. App.CWaco 2006, pet. ref=d), cert. denied, 127 S. Ct. 1141 (2007); see also Lajoie v.
State, 237 S.W.3d 345, 352 (Tex. App.CFort Worth 2007, no pet.).  The
trial court=s decision
should be reversed on appeal only if there is a showing of a clear abuse of
discetion.  Theus v. State, 845
S.W.2d 874, 881 (Tex. Crim. App. 1992). 
Only if the court=s decision falls outside the Azone of reasonable disagreement@ has it abused its discretion.  Montgomery
v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).    

B.  Applicable Law

Article 37.07, section 3(g)
of the Texas Code of Criminal Procedure provides as follows:








On
timely request of the defendant, notice of intent to introduce evidence under
this article shall be given in the same manner required by Rule 404(b), Texas
Rules of Evidence. If the attorney representing the state intends to introduce
an extraneous crime or bad act that has not resulted in a final conviction in a
court of record or a probated or suspended sentence, notice of that intent is
reasonable only if the notice includes the date on which and the county in
which the alleged crime or bad act occurred and the name of the alleged victim
of the crime or bad act. The requirement under this subsection that the
attorney representing the state give notice applies only if the defendant makes
a timely request to the attorney representing the state for the notice.

 

TEX. CODE CRIM. PROC. ANN.
art. 37.07, '3(g) (Vernon
Supp. 2007).  

C.  Analysis

On July 22, 2004, appellant
properly filed his request for notice of extraneous offenses and offenses to be
used for enhancements under article 37.07, ' 3(g) of the code of criminal procedure and rule of evidence
404(b).  TEX. CODE CRIM. PROC. ANN. art. 37.07,
' 3(g); TEX. R. EVID. 404(b).  The State filed its first notice of intent to
offer extraneous offenses on April 28, 2006. 
On June 22, 2006, the State filed its supplemental notice of intent to
offer extraneous offenses.  Subsequently,
on June 13, 2007, the State filed its second supplemental notice of intent to
introduce evidence of extraneous offenses, other crimes, wrongs and acts under
article 37.07, ' 3(g).  The State=s second supplemental notice indicated that the State intended to
offer the testimony of Paula, appellant=s former stepdaughter, during the punishment phase to show that
appellant had sexually abused Paula. 
This notice was filed nine days before the beginning of the guilt-innocence
phase of trial and fourteen days before the beginning of the punishment phase. 








The State, on timely request
by the defendant, must give reasonable notice of extraneous crimes or bad acts
that the State intends to introduce during the punishment phase. Tex. Code Crim. Proc. Ann. art. 37.07, ' 3(g); Burling v. State, 83 S.W.3d 199, 202B03 (Tex. App.CFort Worth
2002, pet. ref=d).  To be reasonable, the State=s notice must be given in advance of trial and must include the date
on which and the county in which the alleged offense occurred and the
complainant's name. Tex. Code Crim.
Proc. Ann. art. 37.07, ' 3(g). The purpose of the notice requirement is to prevent unfair
surprise to a defendant.  Wallace v.
State, 135 S.W.3d 114, 120 (Tex. App.CTyler 2004, no pet.); Burling, 83 S.W.3d at 203; Nance v.
State, 946 S.W.2d 490, 493 (Tex. App.CFort Worth 1997, pet. ref=d).  Further, the reasonableness
of the notice turns on the facts and circumstances of each case.  Scott v. State, 57 S.W.3d 476, 480
(Tex. App.CWaco 2001,
pet. ref=d); see Fugate v. State, 200 S.W.3d 781, 783 (Tex. App.CFort Worth 2006, no pet.).  








On June 21, 2007, appellant
filed a motion for continuance alleging that he did not have adequate time to
investigate Paula=s sexual
abuse allegations.  In his motion,
appellant acknowledged that the State did not learn of the extraneous offense
until June 13, 2007, when Paula told her therapist about the abuse.  Accordingly, appellant stated that the
prosecutor informed him about Paula=s testimony that same day.

Because the record shows that
the prosecutor informed appellant of the extraneous offense evidence as soon as
the prosecutor discovered it, which was nine days prior to trial and fourteen
days before it was actually used at punishment, we hold that the trial court
did not abuse its discretion by overruling appellant=s objection to the introduction of the evidence.  See Scott, 57 S.W.3d at 483
(determining that six days= notice before trial was sufficient under facts of the case); Henderson
v. State, 29 S.W.3d 616, 625 (Tex. App.CHouston [1st Dist.] 2000, pet. ref=d.) (holding that eight days= notice of extraneous offense was reasonable when the prosecutor
discovered the information eight days before the testimony in the punishment
phase); see also Fugate, 200 S.W.3d at 783 (holding that seven days= prior notice of intent to enhance punishment was adequate under facts
of the case.)  Accordingly, we overrule
appellant=s second
point.

 

 

 

 

 








                                          V.  Conclusion

Having overruled appellant=s two points, we affirm the trial court=s judgment.

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL
F: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

 

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:
June 19, 2008

 

 











[1]See TEX. R. APP. P.
47.4.





[2]Cf. TEX. R. APP. P.
9.8, 71 Tex. B.J. 287-88 (Tex.
2008, scheduled to take effect Sept. 1, 2008) (authorizing appellate courts to
redact the names of minor children and parents in appellate proceedings
following parental-rights termination proceedings or juvenile court proceedings
and replace them with fictitious names). 
Therefore, the names of minors and parents have been redacted and
replaced with fictitious names.





[3]The
jury acquitted appellant of three counts of aggravated sexual assault of a
child.  Additionally, the State did not
proceed to trial on an additional indecency with a child offense. 





[4]The
testimony of a child victim alone is sufficient to support a conviction for
indecency with a child.  Johnston v.
State, 230 S.W.3d 450, 455 (Tex. App.CFort Worth, 2007 no
pet.).  





[5]In
its brief, the State argues that appellant did not properly preserve error
because he did not repeatedly object to the extraneous offense testimony.  However, appellant objected four times before
asking for a running objection from the trial court.  Additionally, when appellant asked for a
running objection, the trial court stated, AMa=am,
you have your objection.  I=ve
given it to you.@  Thus, the record demonstrates that appellant
properly preserved error to this issue because the trial court clearly
understood the extent and nature of appellant=s
objection and ruled on it. See Tex.
R. App. P. 33.1(a).