

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00070-CR
### NO. 02-10-00071-CR

MARK GREGORY OWENS                                                                    APPELLANT

V.

THE STATE OF TEXAS                                                                            STATE

----------

## FROM THE 43RD DISTRICT COURT OF PARKER COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In six points, Appellant Mark Gregory Owens appeals the trial court's judgments convicting him of possession of child pornography and aggravated sexual assault of a child.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

The State charged Owens with possession of child pornography and aggravated sexual assault of a child and sought to enhance punishment on both charges with prior felony convictions. The trial court consolidated the cases.

The evidence at trial reflected that Owens had moved in with his niece Megan and Megan's two-year-old child H.G. in October 2008, after his daughter Kristie moved to Florida. Kristie left her two-year-old child K.L. with Kristie's mother, and K.L. would stay with Owens on the weekends.

On October 31, 2008, Megan took H.G. trick-or-treating. At some point either that day or the next, she and Owens spoke about Halloween and about H.G.'s and K.L.'s costumes. Owens handed his cell phone to Megan to show her some photos of K.L. wearing a Cinderella costume. But Megan flipped too far through Owens's cell phone photos and saw a photo of "[a] little girl with her legs open" and a man wearing pink panties, with his penis on the little girl's vagina. She could not see the little girl's face, and she did not know if the photo was of her daughter or K.L. Megan testified that she was in shock and that she just closed the phone and gave it back to Owens, who was standing across from her and could not see what she had seen.

The next day, while Owens was bathing K.L., Megan picked up his phone from the coffee table in the living room and looked through his photos again to confirm what she had seen. She saw the original photo and two more like it, then woke her boyfriend, took H.G., and went to her mother's house. Megan told her

2

mother and stepfather what she had seen, and they called the police. Megan's mother, Megan, and H.G. went to a park near Megan's house to meet the police. Megan's stepfather, George Green, went to Megan's house by himself because he worried that Owens might leave before the police could arrive.

George stalled Owens, chatting, until the police arrived. Corporal Rusty Arnold of the Parker County Sheriff's Office knocked on the door, told Owens that the police were there because of allegations that he was in possession of a phone containing child pornography, and asked Owens where his cell phone was. Owens first said that he had loaned his phone to his brother, who was in Dallas, but after the corporal told him that they would detain him until a search warrant could be obtained for the phone, Owens said, "Okay. My phone's in here. It's been shut off. It hasn't worked in a long time." Corporal Arnold testified that he explained to Owens that he and another officer would be escorting him inside the residence, and the corporal explained at trial that they did this to preserve the evidence by preventing Owens from deleting any photos from the phone.

Owens went into the kitchen, removed a phone from a drawer, and gave it to the officers. Owens told the officers that they could look through the phone, although he later refused to sign a consent-to-search form for it, and an officer took the phone outside. Corporal Arnold said that this phone did not match the description of the phone that Megan had given him. Megan and her mother were waiting outside when a deputy emerged from the house with a cell phone.

3

Megan told the deputy that the phone he held was not Owens's phone with the photos but rather one that she kept in the kitchen junk drawer because it did not work.

George testified that Owens's phone was in plain sight in the living room, resting on the end table next to where George sat and that while Owens was in the kitchen with the deputy, Owens turned his body so that the deputy could not see his face and motioned to George to take the phone, mouthing, "My phone . . . take my phone and leave." George said, "[I]t was clear that he wanted me to take the phone." Then Owens asked if George could leave, and the deputy said, "Yes." George grabbed the phone from the end table as if it was his and walked outside.

Once outside, George handed Owens's phone to Corporal Arnold, who was talking with Megan. The jury heard an audio recording taken immediately after George left the house with the phone, in which George told Corporal Arnold that Owens had motioned for him to take the phone and to break it. At some point, George or Megan told the police that the phone George gave to Corporal Arnold was the one containing the photos.

When Investigator Sammy Slatten arrived, Corporal Arnold released the phones to him and told him how he had obtained them. Investigator Slatten took both phones back inside the house and asked Owens if the phone that he had given to the police was his phone. Owens said, "Yes." When Investigator

4

Slatten next asked whether the other phone—the one George had given to the police—was his, Owens said, "No."

Investigator Slatten testified that Megan described to him the photos she had seen, which phone they were on, and whose phone it was. Investigator Slatten asked Megan "to go to the photograph that she had observed so that [he] could physically see the photograph that she had observed," and she did so.

Outside the jury's presence, Investigator Slatten testified that when he made the decision to look at the phone, it was his understanding that Owens was saying, "That phone is not mine," and that Owens had told George to take the phone and to break it. Investigator Slatten said that he had some doubt—albeit, not much—as to whether the phone in question was actually Owens's. Owens moved to suppress the photos found during the search of his phone, and the trial court denied this motion.

Before the jury, Investigator Slatten admitted that he did not have a search warrant or Owens's consent when he viewed the images on the phone, and he admitted that nothing prevented him from getting a search warrant before he looked at the phone's contents. He secured a search warrant for the phone before Detective Troy Lawrence performed a forensic examination of it. Investigator Slatten stated to the jury that Owens had denied that the phone was his, that he had been told that Owens told George to take the phone and break it, and that Megan was the one who scrolled through the phone to show him the photos. Investigator Slatten agreed that Owens was inside the house, in the

5

custody of either Corporal Arnold or Sergeant King or both when he viewed the photos. Corporal Arnold testified that Investigator Slatten did not tell him to put Owens under arrest until after Investigator Slatten viewed the photos on the phone.

Megan testified that besides the photo of the man's penis touching the little girl's genitals, the phone also contained a photo of "a man with his pants down and a baby laying on top of him with her clothes off. And the other was just a baby naked with her legs open. And it didn't show a face or anything," just a close-up of the little girl's genitals. All three photos focused on the genital area. Megan clarified that by "baby," she meant a child with the size and shape of a two-year-old. Investigator Slatten described the same photos that Megan described, clarifying that the photo of the nude male with the nude toddler straddling him appeared to have been taken in a mirror,[2] and adding that the phone also had a photo of a toddler in a Halloween princess dress. Megan told Investigator Slatten that the three pornographic photos appeared to have been taken in Owens's bedroom.

---

[2]Owens gave the police consent to search his bedroom, where they found a mirror. Investigator Slatten called Megan later and asked her to bring to the sheriff's office the mirror from Owens's room and the pink panties worn in one of the photos, which she found in her daughter's room.

Detective Lawrence performed the forensic examination of Owens's phone, and State's Exhibits 13 through 17 were admitted through his testimony.[3] Detective Lawrence testified that the photos of the child wearing a Cinderella costume and the sexually explicit photos of the naked female child were taken with Owens's phone, and the last Cinderella photo was taken within thirty-seven minutes of the first of the child pornography photos. The other two child pornography photos were taken just a few minutes later—all of them were taken within six minutes of each other.

Investigator Slatten interviewed Owens on November 2, 2008, after Owens was arrested, and he interviewed Owens again the next day. The trial court denied Owens's motion to suppress his statements made during his interviews, admitted portions of these recorded statements as State's Exhibits 8 and 9 over Owens's objections, and allowed them to be published to the jury.

State's Exhibit 8 began taping at 5:45 p.m. and ended around an hour later. Owens entered the interview room in jail clothes. Investigator Slatten read Owens his rights while Owens read along and initialed each to show that he understood each one. After Owens received his warnings, he asked the

---

[3]State's Exhibit 13 is a print out of the phone's "sent" text messages, State's Exhibit 14 is a print out of the phone's inbox containing "received" text messages, State's Exhibit 15 is a print out of the phone's call log history, State's Exhibit 16 is a print out of the list of photos on the phone, with their dates, times, and file names, and State's Exhibit 17 is a compact disk containing all of the photos that Detective Lawrence could copy from the phone. One of the "sent" text messages in State's Exhibit 13 reads, "Can I get [K.L.] when I get off work?"

investigator for something to drink, and Investigator Slatten got some water for him. Owens waived his rights and told the investigator that he took photos of K.L. in her Cinderella costume with his phone, but he denied that he knew how the pornographic photos ended up on his phone, that he took them, and that he would have done anything to hurt K.L. or Megan's child. Owens stated that only he and Megan had been with K.L. that weekend. He also stated that he recalled telling George to take the phone but that he did not tell George to break it. Owens stated that he did not know why the police wanted his phone when they came to the house and asked him for it and that he thought it might have been because he might have threatened someone. Investigator Slatten told Owens that he would come and speak with Owens again and bring the photos once he had had them developed.

State's Exhibit 9 began taping at 6:09 p.m. and ended around thirty minutes later. Investigator Slatten read Owens his rights again, Owens initialed them again and waived them again, and Investigator Slatten showed Owens photographs from the phone. At first, Owens continued to deny that he recalled taking the photos or pressing his penis against K.L.'s genitals. He recalled taking K.L. trick-or-treating and said that no one was home when they returned. Investigator Slatten told Owens that because there was some confusion over whether the phone was his or not, he had obtained a search warrant and was going to send the phone for a forensic exam.

During the second interview, Owens told Investigator Slatten that he knew he had a problem with touching children and that he needed help with it. The interview was almost over when Owens admitted, "I remember taking the naked pictures." Owens said that he took the photos in his room, that K.L. was awake when he took the photos, that he took the first photo with K.L. sitting on the edge of the bed, and that he took the photo of K.L. straddling him by using a mirror, which he confirmed was the one the police found behind his dresser. With regard to the pink underwear, Owens told Investigator Slatten, sometimes "the stuff" (methamphetamine) makes him want to dress like a woman. Owens assured Investigator Slatten that he did not penetrate K.L.'s vagina.

During the guilt-innocence phase of trial, the jury also learned that the electronic monitoring company received a "strap cut" signal from Owens's electronic monitor on May 11, 2009, and that Owens failed to appear for trial on June 23, 2009. Owens remained at large for three to four months before the Alvarado police apprehended him after a high-speed chase in the early hours of November 2, 2009. The jury found Owens guilty of both charges.

Prior to trial, Owens filed a motion for expert assistance in preparing and presenting mitigating evidence at the penalty phase of his trial, which the trial court denied. The State's only witnesses during punishment were its fingerprint expert and Investigator Slatten. Additional portions of Owens's interviews with Investigator Slatten were played for the jury as State's Exhibits 8A and 9A and

9

are set out in greater detail below. Owens did not offer any evidence during punishment.

Owens made several objections during the State's closing argument during punishment—also discussed in greater detail below—which the trial court overruled, and the jury found the enhancement allegations true. The jury assessed twenty years' confinement for the pornography possession conviction. Owens received an automatic life sentence for the aggravated sexual assault conviction. The trial court sentenced Owens accordingly, and this appeal followed.

### III. Motion to Suppress

In his first two points, Owens complains that the trial court erred by failing to suppress evidence taken from Owens's cell phone and Owens's statements during his two interviews with Investigator Slatten.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex.

10

Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When, as here, the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling

11

de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## B. Third Party Interventions and Abandonment

In his first point, Owens argues that his Fourth Amendment rights were violated when Corporal Arnold seized his phone and Investigator Slatten searched it. Owens challenges the admission of State's Exhibits 2 (the pornographic photos), 4 (his phone), and 6 (photos of the house and his bedroom),[4] and he specifically complains that the search of his phone was illegal because: (1) Corporal Arnold had already secured the phone and there were no exigent circumstances requiring the search; (2) there was no evidence to show abandonment of his expectation of privacy in his phone; and (3) he did not consent to the search. It is undisputed that Owens did not consent to a search of his phone.

---

[4]Owens gave consent to search his bedroom and the house, and the eight photographs of the house in State's Exhibit 6 were admitted without objection. Therefore, we overrule this portion of his first point.

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672; *see Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App. 2009). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador*, 221 S.W.3d at 672. Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). However, the Fourth Amendment's prohibition against unreasonable searches and seizures does not apply to the actions of private individuals when those individuals are not acting as agents of the government. *Dawson v. State*, 106 S.W.3d 388, 391 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The defendant bears the burden of proving that a private party acted as an agent of the government. *Id.* at 392.

Owens argues that George's testimony establishes only George's subjective belief of what Owens wanted and an unsuccessful attempt by Owens to hide evidence rather than the abandonment of his expectation of privacy in his phone. Owens directs us only to George's testimony with regard to his abandonment argument.

13

George's testimony and the audio recording taken by Corporal Arnold establish that Owens communicated to George that he should take the phone and destroy it and that George took the phone but instead handed it to the police outside. The trial court determined George's credibility, and nothing in the record indicates that the officers knew or acquiesced in the deception perpetrated on Owens by George. *See Escobedo v. State*, No. 08-08-00318-CR, 2010 WL 2621579, at *1 & n.1, 4 (Tex. App.—El Paso June 30, 2010, no pet.) (not designated for publication) (upholding denial of motion to suppress when appellant's roommate's fourteen-year-old son told police that appellant would change the numbers on "stickers"—automobile registration decals—retrieved the stickers from the apartment, and handed them to the police without any direction or inducement by police because the officer did not anticipate or acquiesce in the boy's intrusive conduct); *Hopwood v. State*, No. 05-05-00110-CR, 2006 WL 349503, at *2 (Tex. App.—Dallas Feb. 16, 2006, pet. ref'd) (not designated for publication) (upholding denial of motion to suppress when appellant did not present evidence that the computer repairmen acted as instruments or agents of the State, that the State knew of or acquiesced in the conduct resulting in the initial discovery of child pornography, or that the repairmen intended to assist law enforcement when they first viewed the images). The trial court had the discretion to find George credible and to conclude as a matter of law that George was not acting as a government agent when he took Owens's phone and gave it

14

to the police instead of destroying it as Owens had requested. We overrule this portion of Owens's first point.

Next, we note that, contrary to Owens's claims that Investigator Slatten "immediately accessed the phone to observe its contents," the record reflects otherwise and reveals another instance of abandonment that Owens does not address.

The record reflects that when Investigator Slatten arrived at the scene, he removed the phone from where Corporal Arnold had secured it with the other phone, but, contrary to Owens's argument that the investigator then "immediately accessed the phone to observe its contents," the record shows that the investigator took both phones back into the house. He first showed Owens the cell phone that Owens had produced from the kitchen's junk drawer. Owens said that the phone was his. He then showed Owens the cell phone that George had removed from the house. Owens told the investigator that this phone was not his. Because Owens disclaimed the phone with the photographs after George took it and gave it to the police, if there was no police misconduct to force him to deny the phone, then there was no unlawful search. *See Hawkins v. State*, 758 S.W.2d 255, 257 (Tex. Crim. App. 1988) (stating that when ownership of property is abandoned or disclaimed prior to a search, no Fourth Amendment violation occurs because the defendant has no legitimate expectation of privacy in property that has been abandoned); *see also Swearingen v. State*, 101 S.W.3d 89, 101 (Tex. Crim. App. 2003) (stating that abandonment occurs if the

15

defendant intended to abandon the property and his decision to abandon it is not due to police misconduct and that when a defendant voluntarily abandons property, he lacks standing to contest the reasonableness of a search of the abandoned property); *State v. Velasquez*, 994 S.W.2d 676, 678–79 (Tex. Crim. App. 1999) (holding that appellant abandoned bag containing cocaine and marihuana when he denied ownership of it at least twice and voiced no objection to the officer's search of the bag and there was no evidence of police misconduct); *McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App.) *cert. denied*, 522 U.S. 844 (1997) (stating that intent to abandon may be inferred from words spoken, acts done, and other objective facts and relevant circumstances); *Bayhavong v. State*, No. 01-04-01120-CR, 2006 WL 407790, at *2–3 (Tex. App.—Houston [1st Dist.] Feb. 23, 2006, no pet.) (mem. op., not designated for publication) (holding that denying ownership of a bag "is sufficient evidence of a person's intent to relinquish this expectation of privacy" in the bag) (citing *Tankoy v. State*, 738 S.W.2d 63, 67 (Tex. App.—Houston [1st Dist.] 1987, no pet.) (same)).

"The validity of a search of allegedly abandoned evidence will turn on the nexus between the alleged abandonment and the legality of a person's detention." *Hawkins*, 758 S.W.2d at 260. Nothing in the record indicates how long Owens was in the house with the police prior to his arrest, that he was in fact detained—other than Investigator Slatten's testimony that Owens was either in Corporal Arnold's or Sergeant King's "custody" while inside the house—or that

16

if he was detained, the detention was unreasonable. Applying the appropriate standard of review, we conclude that the trial court did not err by denying Owens's motion to suppress the evidence obtained from his phone, and we overrule the remainder of his first point.

## C. Promises

In his second point, Owens challenges the admission of State's Exhibits 8, 8A, 9, and 9A, arguing that the trial court erred by denying his motion to suppress the statements he made to Owens because "[i]t is clear that the interrogating officer . . . informed [Owens] that making a statement could help him in his trial" and that this was an improper inducement. He also complains that the improper search of his phone led to the discovery of the photos, which "were then exploited to obtain later incriminating statements over 2 separate custodial interrogations"; however, based on our resolution above, we need not address this portion of his complaint. *See* Tex. R. App. P. 47.1.

A statement may be used in evidence against an accused if it appears that the statement was "freely and voluntarily made without compulsion or persuasion." Tex. Code Crim. Proc. Ann. art. 38.21 (West 2005). For a promise to render a confession invalid, it must be positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully. *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004). "Before a promise will render a confession inadmissible, it must be shown that the promise induced the confession." *Muniz v. State*, 851

17

S.W.2d 238, 254 (Tex. Crim. App.) (noting that general statements made to a suspect that a confession may sometimes result in leniency do not render a confession involuntary because this is a statement of fact, not a promise in exchange for a confession), *cert*. *denied*, 510 U.S. 837 (1993).

We have reviewed State's Exhibits 8, 8A, 9, and 9A and cannot discern any words spoken by Investigator Slatten that could be construed as (1) informing Owens "that making a statement could help him in his trial" or as (2) an improper inducement to confess. Therefore, we overrule Owens's second point.

### IV. Punishment

In his third point, Owens complains that the trial court abused its discretion by denying his request for a mitigation expert to be appointed to assist in the investigation and presentation of mitigating evidence during the trial's punishment phase. In his fourth and fifth points, he contends that the trial court erred by denying his motions for mistrial. And in his sixth point, Owens argues that the trial court abused its discretion by imposing an automatic life sentence.

### A. Punishment Trial

After the jury returned its guilty verdicts, and outside the jury's presence, the State informed the trial court that it intended to abandon the date allegations in each of its enhancement notices and to "just go with the court, the county, the cause number, and the rest of that as described in there," stating that the date allegations were surplusage. Owens complained that the State had misstated

18

the dates, thus depriving him of notice, and offered Defense Exhibit 6, a copy of a 1988 conviction for second-degree indecency with a child, which the trial court admitted. Owens also admitted that he "was given notice by being given copies of a prior conviction that occurred in 1988."

The State acknowledged that the date was wrong in the enhancement for the mandatory life sentence in the aggravated sexual assault of a child case but pointed out that because Owens *knew* which conviction they were talking about—as illustrated by Defense Exhibit 6, which had the correct cause number, court, style, and offense—"it doesn't sound like we have any issue as to notice." The State pointed out that the reason Owens had Defense Exhibit 6 was because the State had given it to him. The trial court overruled Owens's objection, stating that the date was just "a matter of identifying what you're talking about," and allowing the State to abandon the date and identify the conviction by cause number and style. The trial court denied Owens's request for a continuance.

At the commencement of the punishment trial, the State read the enhancement paragraphs. The enhancement paragraph in the possession-of-child-pornography case alleged that Owens had been convicted of felony taking and attempted taking a weapon from a peace officer in the 363rd Judicial District Court of Dallas County, Texas, in Cause No. F-9229649. The enhancement paragraph in the aggravated-sexual-assault-of-a-child case alleged that Owens had been convicted of the felony offense of indecency with a child by contact in

19

the Criminal District Court No. 2 of Tarrant County, Texas, in Cause No. 0268223D. Owens pleaded "not true" to both enhancement paragraphs.

The trial court admitted State's Exhibits 19, 20, 21, and 22 through the testimony of Weatherford Police Officer Beth Turnbow, the State's fingerprint expert. State's Exhibits 19 and 21 are copies of Owens's 1992 conviction in cause number F-9229649 for the taking and attempted taking of a weapon from a peace officer, for which Owens plea-bargained for six years' confinement. State's Exhibit 20 is a copy of Owens's 1988 indecency with a child by contact conviction in cause number 0268223D, in Criminal District Court Number 2 of Tarrant County—the same conviction as in Defense Exhibit 6—which judgment revoked Owens's probation. State's Exhibit 22 contains Owens's fingerprints, which Officer Turnbow took before trial. The exhibits were admitted in evidence and published to the jury subject to Owens's objections to State's Exhibit 20, discussed in greater detail above. Officer Turnbow testified that the fingerprints in State's Exhibits 19 through 21 matched the fingerprints in State's Exhibit 22— that is, she determined that Owens made all of the fingerprints in these exhibits.

Investigator Slatten testified about Owens describing his thirty-year drug abuse history during his interviews. Additional portions of State's Exhibits 8 and 9 were admitted and published as State's Exhibits 8A and 9A. Investigator Slatten testified, and the recordings confirmed, that Owens had pleaded guilty to indecency with a child by contact (fondling) in Tarrant County and that Owens said that he deliberately tried to stay away from small children because of his

issues with them. The recordings revealed that the police found marijuana and drug paraphernalia in Owens's room, that Owens said that he "doped up" every weekend, and that Owens said that he had been on methamphetamine for thirty years. In State's Exhibit 8A, Owens said, "I don't think about touching kids when I'm not on meth," and he admitted that he should not have obtained drugs before going to get K.L. that weekend. He took methamphetamine before he went to pick K.L. up—he was already high when he drove to get her—and when they returned to the house after trick-or-treating, he took more. Owens admitted that he had a problem with touching children but blamed his problem on his underlying methamphetamine addiction. He also admitted to beating a male child "pretty bad" when the child was two or three but stated that he did not sexually assault the boy, that he was not arrested or charged with penetration, and that he thought someone else had sexually assaulted that child. The details of Investigator Slatten's testimony during cross-examination are set out below.

After Investigator Slatten's testimony, the State rested, and while the jury was in recess, Owens's counsel informed the trial court,

> The only other witness that was identified to us or that we discovered any mitigating facts from is the defendant's mother. We've talked with her extensively, including just a few moments ago. . . . [A]fter talking with her, she doesn't want to testify. We don't want to call her under these circumstances.

Owens agreed with his defense counsel that he was okay with not calling his mother to testify. The defense rested, and both sides closed upon the jury's

21

return. We address the State's closing argument below, in the context of Owens's fourth and fifth points.

## B. Automatic Life Sentence

In his sixth point, Owens complains that he should not have received an automatic life sentence for his aggravated sexual assault of a child conviction.

Under section 12.42(c)(2), a defendant shall be punished by imprisonment for life if he is convicted of an offense under section 22.021 of the penal code, among others, and he has previously been convicted of an offense under section 21.11 (indecency with a child), among others. *See* Tex. Penal Code Ann. § 12.42(c)(2)(A)(i), (B)(ii) (West 2011).

Owens complains that "[i]t was not until after the guilty verdicts were delivered that the State attempted to abandon the dates alleged as to the prior felony convictions and that:

> [i]n light of the extremely harsh nature of the punishment in light of proof of a second sexual offense[,] it is not too much to ask that the State give correct notice of the dates of conviction for the prior conviction. Once alleged[,] these identifiers for a conviction are not surplusage but instead form an essential part of the due process notice required for a successful and proper enhancement of punishment. Strict proof should be required of each and every allegation made by the State to prove such a conviction. In this case, the State did not allege the correct date of the prior felony conviction and thus should not be able to ignore the same to obtain the enhanced penalty herein.

Owens appears to make two complaints: (1) that he did not receive proper notice of the prior conviction because the date of conviction is not surplusage

22

and (2) that the State did not sufficiently prove the prior conviction.[5]  We address the second complaint first.

"To establish that a defendant was convicted of an enhancement offense, the State must (1) prove the existence of the conviction and (2) link the conviction to the defendant." *Davis v. State*, 268 S.W.3d 683, 715 (Tex. App.— Fort Worth 2008, pet. ref'd); *see also Flowers v. State,* 220 S.W.3d 919, 921 (Tex. Crim. App. 2007) (stating same).  "No specific document or mode of proof is required to prove these two elements" as long as they are proved beyond a reasonable doubt.  *Flowers*, 220 S.W.3d at 921 (noting that there is no "best evidence" rule in Texas that requires that the fact of a prior conviction be proven with any document, much less any specific document).  The State may prove both of these elements in a number of different ways, including (1) the defendant's admission or stipulation, (2) testimony by a person who was present when the person was convicted of the specified crime and can identify the defendant as that person, or (3) documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted.  *Id.* at 921–22.  Because Owens admitted in his second videotaped interview with Investigator Slatten that he had an indecency with a child conviction from Tarrant County and the State

---

[5]Owens does not argue that he was prejudiced by the trial court's denial of his motion for continuance.

23

offered, and the trial court admitted, documentary proof of the conviction and Owens's identity, we overrule this portion of Owens's sixth point. *See id*.

With regard to Owens's notice-surplusage argument, on February 19, 2009, the State filed its notice of intent to use prior convictions to enhance punishment under penal code section 12.42, listing the 1992 "taking and attempt taking a weapon from a peace officer" conviction first and then the "felony offense of Indecency With a Child, to-wit: Contact" conviction, alleged to have occurred on August 25, 1998, "in the Criminal District Court Number Two of Tarrant County, Texas, in Cause No. 0268223D, styled the State of Texas vs. Mark Gregory Owens." Also on February 19, 2009, the State filed a notice of intent to use prior convictions to enhance punishment pursuant to penal code section 12.42(c)(2)—Mandatory Life Sentence—and set out the same information above regarding the indecency conviction. On February 8, 2010, the State filed another notice of intent to use prior convictions to enhance punishment pursuant to penal code section 12.42, setting out the same enhancement allegations as its first notice, but reversing the order, listing the 1998 conviction first, followed by the 1992 conviction. The guilt-innocence phase of trial concluded on February 10, 2010—the same day that Owens objected to the dates in the enhancement allegations. The punishment phase of trial began February 16, 2010.

It is not necessary to allege prior convictions for enhancement purposes with the same particularity that must be used in charging on the primary offense,

and variances between an enhancement allegation and the proof with regard to cause numbers, courts, and dates of conviction have all been held to be immaterial. *Freda v. State*, 704 S.W.2d 41, 42–43 (Tex. Crim. App. 1986); *see also Pelache v. State,* 324 S.W.3d 568, 576 (Tex. Crim. App. 2010) ("It is well-settled, however, that due process does not require pretrial notice 'that the trial on the substantive offense will be followed by a habitual criminal proceeding.'"); *Villescas v. State*, 189 S.W.3d 290, 293–94 (Tex. Crim. App. 2006) (same).

Moreover, neither the indictment nor the allegation must allege or recite the dates of conviction as long as the allegations are specific enough to apprise the defendant of the conviction being used against him and as long as the proof at trial shows the necessary succession of offenses and final convictions. *Hernandez v. State*, 530 S.W.2d 563, 568 (Tex. Crim. App. 1975); *see also Hollins v. State*, 571 S.W.2d 873, 875–76 & n.1 (Tex. Crim. App. 1978) (stating that an accused is entitled to "proper notice" of any prior conviction alleged for enhancement so that he is aware that "a greater penalty is to be sought than for a first offense, and to enable him to take issue thereon, and if possible show there is a mistake in identity, or that there was no final former conviction or the like"). The object of the doctrine of variance is to avoid surprise to the defendant; only if the variance was such as to mislead the defendant to his prejudice is the variance considered material. *Freda*, 704 S.W.2d at 42.

Notwithstanding the State's typo—1998 instead of 1988—Owens received notice that the State intended to enhance punishment, and he does not argue

here that he was unfairly surprised by or unable to prepare to defend against the State's attempt to enhance his sentence. To the contrary, the record reflects that for over a year, Owens was aware of the State's intent to enhance his sentence with a conviction for indecency with a child from "the Criminal District Court Number Two of Tarrant County, Texas, in Cause No. 0268223D, styled the State of Texas vs. Mark Gregory Owens," and that this enhancement could result in a life sentence under penal code section 12.42(c)(2). Further, Owens had actual notice, as demonstrated by his offer of Defense Exhibit 6 into evidence at the hearing on his objections, of the conviction the State intended to use.

Because the State was not required to allege the date of the prior, punishment-enhancing conviction in its notice, the erroneous date was immaterial. Likewise, Owens had actual pretrial notice of the conviction that the State intended to use when the allegation in the notice listed the correct cause number, court, and county, even though it incorrectly stated the year. Combined with the copy of the judgment that the State gave to Owens, the allegation sufficiently apprised Owens of the prior conviction being used against him. Further, Owens does not argue that he was misled by the incorrect date or explain how he was prejudiced by it. We overrule the remainder of Owens's sixth point. *See Hollins*, 571 S.W.2d at 875 (stating that "proper notice" is "a description of the judgment of former conviction that will enable [the accused] to find the record and make preparation for a trial of the question whether he is the convict named therein").

26

## C. Motions for Mistrial

Owens moved for mistrial twice during the State's closing argument in the trial's punishment phase. The prosecutor argued:

> We are asking you to find that it is true, that it has been proven to you beyond a reasonable doubt that the person who was convicted in State's Exhibit No. 20 [the 1988 conviction] of indecency with a child was in fact the same person as the person in the courtroom today, Mark Gregory Owen[s].

> Not only did you have the testimony from Beth Turnbow, the fingerprint expert, that it is in fact the same person, but you also heard Mr. Owen[s] admit that on the tape, that he was convicted of that, that that was a charge in Tarrant County.

> Now if you do find that you have proof beyond a reasonable doubt that that is true, which we believe you do, then we're asking you to sign the top—the top verdict form. It says that, "We find that the allegations set out in the Enhancement Paragraph [are] true." That's the blank that we're asking you to sign.

> *Now if you find that it is true, the Judge will automatically assess a sentence that is required by law*. [Emphasis added.]

Owens objected, complaining that it was improper to inform the jury of the result of its verdict. The trial court sustained his objection, granted his requested instruction to disregard, and then denied his motion for mistrial. After the trial court denied Owens's motion for mistrial, the prosecutor resumed her argument, stating,

> And if you do not find that the top paragraph is true, then you'll move to the bottom paragraph.

> So just to be clear, if you find that the top one is true, you're done. If you move to the bottom paragraph, then it says you may assess a punishment from 25 to 99 years or life and a fine. We are

27

not asking you to assess a fine in either case. You don't have to do that if you don't want to.

In the event that you do move to this bottom paragraph, obviously we are asking you for the maximum, which would be 99 years or life. . . . And again, ladies and gentlemen, *I'll just remind you that there's not really any dispute based on the testimony that you heard*— [Emphasis added.]

Owens objected, stating that the prosecutor made a comment on his failure to testify "by saying there's no dispute," and the trial court sustained the objection, instructed the jury not to consider the last comment, and then denied Owens's motion for mistrial. The prosecutor concluded by stating, "Ladies and gentlemen, based on the evidence that you heard, Beth Turnbow told you that it is the same person. And the defendant admitted to the one in Tarrant County."

In his fourth point, Owens complains that the trial court abused its discretion by denying his first motion for mistrial because the prosecutor informed the jury of the result of its verdict in the aggravated sexual assault case as being an automatic sentence. In his fifth point, Owens argues that the trial court abused its discretion by denying his second motion for mistrial because the prosecutor commented on his failure to testify.

### 1. Standard of Review

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim.

28

App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

When a trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004). Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required. *Id.* at 77 ; *see also Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004). In determining whether a trial court abused its discretion by denying a mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect); (2) curative measures; and (3) the certainty of the punishment assessed absent the misconduct. *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

### 2. First Statement

Owens directs us to no authority to support his argument that it was improper for the prosecutor to tell the jury that if it found the felony enhancement allegation to be true "that punishment of life was automatic." Further, the prosecutor never mentioned automatic life punishment. Rather, the prosecutor stated that the trial court would "automatically assess a sentence that is required by law." And while prejudice caused by improper jury argument remarks is

29

"clearly the touchstone" of the "severity of the misconduct" factor, *see Hawkins*, 135 S.W.3d at 77, as the State points out, "[T]here is no error in correctly arguing the law, even if the law is not included in the court's charge." *See Ratliff v. State*, 320 S.W.3d 857, 863 (Tex. App.—Fort Worth 2010, pet. ref'd).

Under section 12.42(c)(2), if the jury found the enhancement allegation "true," then the trial court would punish Owens for life based on his instant conviction under penal code section 22.021 and his prior conviction under section 21.11. *See* Tex. Penal Code Ann. § 12.42(c)(2)(A)(i), (B)(ii). In light of the law, the prosecutor's statement, "Now if you find that it is true, the Judge will automatically assess a sentence that is required by law," is not incorrect, even though it was not included in the jury charge. *See Ratliff*, 320 S.W.3d at 863. Further, even assuming the State's argument was improper, because the trial court issued an instruction to disregard, Owens admitted to his conviction for indecency with a child in the second videotaped interview, and the jury had before it the judgment of conviction for indecency with a child, the jury finding his prior conviction "true" was certain under the circumstances here. *See Hawkins*, 135 S.W.3d at 77; *Mosley*, 983 S.W.2d at 259. We overrule Owens's fourth point.

### 3. Second Statement

In his fifth point, Owens argues that because he did not testify during either the guilt-innocence phase or the punishment phase of his trial and did not offer any evidence or the testimony of any witnesses during the punishment phase,

30

"[i]t was therefore improper for the Prosecutor to argue to the jury that it should find the enhancement allegations to be True because no contradictory evidence ha[d] been offered." Owens complains that because he was the only person who could have offered contrary evidence with regard to the alleged felony convictions, the prosecutor's comment was a direct comment on his failure to testify.

"The test for determining whether prosecutorial argument is a comment on a defendant's failure to testify 'is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify.'" *Busby v. State*, 253 S.W.3d 661, 666 (Tex. Crim. App.) (quoting *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007)), *cert. denied*, 129 S. Ct. 625 (2008). "It is not sufficient that the language used might impliedly or indirectly be so construed." *Id*. And any objectionable argument should be evaluated on a case-by-case basis for what it would "necessarily and naturally" mean to a jury when taken in the full context of its utterance. *Cruz*, 225 S.W.3d at 549 & nn.9–10 (discussing *Wolfe v. State*, 917 S.W.2d 270, 280 (Tex. Crim. App. 1996), in which the court held that a prosecutor's reference in jury argument to information not provided by a defendant at trial was not a comment on his failure to testify when his own exculpatory statement was admitted into evidence).

In *Busby*, the State's closing arguments referred to inconsistencies between statements given to authorities by appellant and referred to his specific

31

statements. 253 S.W.3d at 666. The court concluded that it was "reasonable and proper for the prosecutor to comment on the shifting nature of appellant's custodial statements that were admitted into evidence." *Id.* The court followed *Cruz*, concluding that the controversial portions of the State's arguments referred to specific statements that the appellant had made before trial. *Id.* at 666–67; *see also Cruz*, 225 S.W.3d at 549–50 (concluding that it was clear from the record that the prosecutor's argument to the jury referred to the appellant's own written statement that had been admitted into evidence and was therefore not comments on his failure to testify).

Here, Owens's second recorded interview was played for the jury. In that interview, he admits that he has a conviction for indecency with a child. Owens's recorded statement did not conflict with any of the other testimony during either phase of trial. Based on the context of the State's jury argument, we cannot say that it was "manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *See Busby*, 253 S.W.3d at 666; *Cruz*, 225 S.W.3d at 549. Further, the trial court gave an instruction to the jury to disregard the argument and, as set out above, Owens's punishment was certain under the circumstances here—he admitted to using methamphetamine for thirty years, even though it made him want to touch children inappropriately, and he admitted to taking the pornographic photographs, including the one showing his penis pressed against his two-year-old granddaughter's genitals. *See Hawkins*, 135 S.W.3d at 77;

32

*Mosley*, 983 S.W.2d at 259. Accordingly, the trial court did not abuse its discretion by denying the motion for mistrial, and we overrule Owens's fifth point.

## D. Mitigation Expert

In his third point, Owens complains that although the trial court appointed an investigator to assist his defense counsel,[6] it denied him an expert who could have evaluated and presented the mitigating effect of the evidence collected by the investigator, thus denying him a fair and impartial trial.

Due process requires access to the raw materials integral to the building of an effective defense—including appointment of an expert—but in implementing the right to receive an expert, the defendant has the burden to make a sufficient threshold showing of the need for the expert's assistance. *Griffith v. State*, 983 S.W.2d 282, 286–87 (Tex. Crim. App. 1998) (citing *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 1093 (1985)), *cert. denied*, 528 U.S. 826 (1999). To carry this burden, a defendant must offer more "than undeveloped assertions that the requested assistance would be beneficial." *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997) (citing *Caldwell v. Mississippi*, 472 U.S. 320, 323–24 n.1, 105 S. Ct. 2633, 2637 n.1 (1985)). The defendant must also show that the substance of the expert's testimony is "likely to be a significant factor" at trial. *See Rey v. State*, 897 S.W.2d 333, 339 (Tex. Crim. App. 1995) (citing *Ake*,

---

[6]The trial court appointed not only an investigator but also co-counsel to assist with Owens's case.

470 U.S. at 74, 82–83, 86, 105 S. Ct. at 1091–92, 1095–96, 1097–98). Our court of criminal appeals has noted that

> [i]n cases holding that a sufficient showing was not made under *Ake*, the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof.[7]

*Id.* at 341. In contrast, a defendant meets his threshold burden if he has "made his defensive theory clear to the trial court and supported it with factual allegations and/or evidence that expert testimony would support his theory." *Id.* We analyze whether a defendant made his threshold showing by examining the facts and arguments before the trial court at the time of the defendant's motion. *See id*. at 342 n.8. The key question is "whether there is a high risk of an inaccurate verdict absent the appointment of the requested expert." *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1081 (2000). We review the denial of a motion for expert assistance for an abuse of discretion. *Griffith,* 983 S.W.2d at 287.

Owens argues that he needed a mitigation expert because

> *[i]n the trial* it was developed that [Owens] had been abused as a child and as a result had developed severe alcohol and drug abuse

---

[7]Other than calling Officer Turnbow as its fingerprints expert, the State presented no expert witnesses during the punishment phase of trial, and Owens does not argue that he required an expert with regard to Turnbow's testimony. *See Jackson v. State*, 992 S.W.2d 469, 474 n.5 (Tex. Crim. App. 1999) ("There is no error in refusing to appoint an expert witness to assist an indigent defendant in rebutting a type of expert opinion that the State's witness did not present.").

problems which also played a part in the commission of the instant offense. The record also developed that [Owens's] outcry as a child was not supported by his mother which also affected his development as an adult. All of these matters required expert assistance to not only test but also evaluate and present from a psychological standpoint. [Emphasis added.]

As noted above, however, we must rely on the facts and arguments before the trial court at the time of the defendant's motion in determining whether the trial court abused its discretion by denying the motion.[8] *See Rey*, 897 S.W.2d at 342 n.8.

Owens argued in his motion for expert assistance, which he filed in each case, that it "is necessary that defense counsel be provided with expert

---

[8]Further, the record does not reflect that this testimony was actually developed either at the pretrial hearing on Owens's motion or during the punishment phase of trial. Rather, during the punishment phase cross-examination of Investigator Slatten, Owens's counsel asked the investigator whether he knew that Owens had been abused by his stepfather, to which the investigator replied, "No[,] I did not." Investigator Slatten agreed with the general statements that "a child that was abused between the ages of say eight to 10, that's going to affect them," that "some of the effects that that can have, they'll turn to alcohol and drug use," that "30 years of drug use is going to have a lot of effect on a person," and that "methamphetamine's a scourge" and highly addictive. He said "[N]o," when asked if he had ever interviewed Owens's mother and when asked if he had asked about whether Owens had been abused as a child. On redirect, when asked whether he had any idea of whether Owens had been sexually abused, Investigator Slatten again said, "No." Owens's mother declined to testify and Owens decided not to call her as a witness. Therefore, Owens's argument that he needed an expert because it was developed at trial that Owens had been abused as a child and that his mother failed to support his outcry—affecting his development as an adult and his dependencies on alcohol and drugs—lacks support in the record even if we were to consider it in determining whether the trial court abused its discretion by denying his motion. *See, e.g., Johnston v. State*, 230 S.W.3d 450, 456 n.6 (Tex. App.—Fort Worth 2007, no pet.) (stating that questions are not evidence).

assistance in the area of mental health, sex offender profiling and future dangerousness/risk assessment . . . so that the Defendant may adequately and effectively prepare and present mitigating evidence at the penalty phase of the trial on the merits," attributing this need to "the complicated and serious nature of the cases, the number of witnesses that may be testifying for the State of Texas and against the Defendant, and the number and complexity of the evidence and potential exhibits herein." Owens did not attach an affidavit to his motion or provide any evidence to support these assertions at the hearing on the motion.[9] Rather, at the pretrial hearing, Owens continued his argument that he needed a mitigation expert to help collect and present evidence for punishment for the possession of child pornography charge and, "in the event that the automatic life provision is not triggered," for the aggravated sexual assault charge. He did not give the substance of his proposed expert's testimony or show that such testimony was likely to be a significant factor at trial.[10] *See Rey*, 897 S.W.2d at 339.

---

[9]Although the State claims that the record does not reveal that Owens's motion was ever heard or denied by the trial court, this is incorrect.

[10]During the hearing, the State pointed out to the trial court that because Owens had a prior indecency conviction that the State did not anticipate having any difficulty proving, if found guilty of aggravated sexual assault, Owens would receive a mandatory life sentence and so there would be no punishment hearing on that charge and that, as the cases were consolidated, the State could ask that the sentences be stacked under penal code section 3.03, resulting in life without the possibility of parole, but "whether they're stacked or concurrently really would make no difference as far as how that sentence would actually be served."

36

Based on this record, Owens did not meet his burden to make a threshold showing for appointment of an expert. *See Griffith*, 983 S.W.2d at 287; *Rey*, 897 S.W.2d at 339, 341; *cf. Williams*, 958 S.W.2d at 194–95 (noting that appellant's motion revealed that his mental condition would be a significant factor during punishment, that appellant had related to counsel facts about his history of drug abuse as well as his history of being abused as a child and alleged that these factors could excuse his conduct or be a factor in mitigation of punishment, and that the proposed expert's affidavit attached to the motion included the expert's qualifications and her statements that her conclusions in the affidavit only amounted to a preliminary evaluation, her conclusions as to certain disorders from which appellant might be suffering, and a statement that a complete evaluation would require further testing and evaluation). We overrule Owens's third point.

## V. Conclusion

Having overruled all of Owens's points, we affirm the trial court's judgments.

PER CURIAM

PANEL: MCCOY, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 18, 2011